# 19-2979-cv(L), 19-3187-cv(XAP)

## United States Court of Appeals

*for the*

## Second Circuit

———◆———

SONTERRA CAPITAL MASTER FUND, LTD., on behalf of itself and all others similarly situated, RICHARD DENNIS, on behalf of themselves and all others similarly situated, FRONTPOINT EUROPEAN FUND L.P., on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants-Cross-Appellees,*

– v. –

UBS AG,

*Defendant-Appellee-Cross-Appellant,*

BARCLAYS BANK PLC, COOPERATIVE CENTRALE RAIFFEISEN-BOERENLEENBANK B.A., DEUTSCHE BANK AG, LLOYDS BANKING GROUP PLC, THE ROYAL BANK OF SCOTLAND PLC, JOHN DOES 1-50, BARCLAYS CAPITAL INC.,

*Defendants-Appellees.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT BRIEF FOR DEFENDANTS-APPELLEES

MARC J. GOTTRIDGE
LISA J. FRIED
HERBERT SMITH FREEHILLS
    NEW YORK LLP
450 Lexington Avenue
New York, New York 10017
(917) 542-7601
marc.gottridge@hsf.com
lisa.fried@hsf.com

BENJAMIN A. FLEMING
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, New York 10017
(212) 918-3000
benjamin.fleming@hoganlovells.com

*Counsel for Defendant-Appellee Lloyds Banking Group plc*
*(For Continuation of Appearances See Inside Cover)*

JEFFREY T. SCOTT
MATTHEW J. PORPORA
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000
scottj@sullcrom.com
porporam@sullcrom.com

*Counsel for Defendants-Appellees
 Barclays Bank PLC and Barclays
 Capital Inc.*

DAVID R. GELFAND
TAWFIQ S. RANGWALA
MILBANK LLP
55 Hudson Yards
New York, New York 10001
(212) 530-5000
dgelfand@milbank.com
trangwala@milbank.com

– and –

MARK D. VILLAVERDE
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
(424) 386-4000
mvillaverde@milbank.com

*Counsel for Defendant-Appellee
 Coöperatieve Rabobank U.A.*

MARK A. KIRSCH
ERIC J. STOCK
JEFFERSON E. BELL
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000
mkirsch@gibsondunn.com
estock@gibsondunn.com
jbell@gibsondunn.com

*Counsel for Defendant-Appellee-Cross-
 Appellant UBS AG*

DAVID S. LESSER
LAURA HARRIS
KING & SPALDING LLP
1185 Avenue of the Americas,
 34th Floor
New York, New York 10036
(212) 556 2100
dlesser@kslaw.com
lharris@kslaw.com

– and –

G. PATRICK MONTGOMERY
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW,
 2nd Floor
Washington, D.C. 20006
(202) 737 0500
pmontgomery@kslaw.com

*Counsel for Defendant-Appellee
 The Royal Bank of Scotland plc
 (n/k/a NatWest Markets plc)*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the undersigned Defendants-Appellees make the following disclosures:

## BARCLAYS DEFENDANTS

Defendant-Appellee Barclays Bank PLC is a wholly owned subsidiary of Barclays PLC, which is a publicly held corporation, and no other publicly traded company owns 10 percent or more of Barclays Bank PLC's stock.

Defendant-Appellee Barclays Capital Inc. identifies the following as parent corporations or publicly held corporations that own 10 percent or more of any class of its equity interests:  Barclays PLC, Barclays Bank PLC, Barclays US Holdings Ltd., Barclays US LLC, and Barclays Group US Inc.

## COÖPERATIEVE RABOBANK U.A.

Defendant-Appellee Coöperatieve Rabobank U.A. ("Rabobank") has no parent corporation and no publicly held company owns 10 percent or more of Rabobank.

## LLOYDS BANKING GROUP PLC

Defendant-Appellee Lloyds Banking Group plc ("LBG") has no parent corporation; it is a publicly held corporation, and no publicly held company owns 10% or more of LBG's stock.

## THE ROYAL BANK OF SCOTLAND PLC

Defendant-Appellee The Royal Bank of Scotland plc (n/k/a NatWest Markets plc) is a wholly owned subsidiary of The Royal Bank of Scotland Group plc (n/k/a NatWest Group plc) ("RBS Group"). RBS Group has no parent company and no publicly held company owns 10 percent or more of its stock.

## UBS AG

UBS AG is wholly owned by UBS Group AG, a publicly traded corporation, and no publicly held corporation holds 10% or more of UBS Group AG stock. UBS Group AG does not have a parent company.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ......................................... i

INTRODUCTION ................................................................ 1

STATEMENT OF THE ISSUES ................................................. 4

COUNTER-STATEMENT OF THE CASE ............................... 5

    A.    Sterling LIBOR ................................................ 5

    B.    Defendants and Their Alleged Conduct............................ 6

    C.    Plaintiffs ........................................................ 8

    D.    Procedural History ........................................... 12

SUMMARY OF THE ARGUMENT ..................................... 16

ARGUMENT .................................................................. 18

I.    THE DISTRICT COURT CORRECTLY DISMISSED
    FRONTPOINT'S CLAIMS AND DENIED
    SUBSTITUTION OF FLH AS PLAINTIFF.............................. 18

    A.    FLH Could Not Assert FrontPoint's Antitrust Claim
       Because the APA Did Not Assign Such Claims to
       FLH. ................................................................. 18

    B.    Substitution Would Have Been Improper Under Rule
       17(a). ................................................................ 25

II.    THE DISTRICT COURT CORRECTLY DISMISSED ALL
    PLAINTIFFS' ANTITRUST CLAIMS...................................... 27

    A.    Plaintiffs Lack Antitrust Standing..................................... 27

       1.    *Schwab II* Confirms That Sonterra and Dennis
          Are Not Efficient Enforcers..................................... 28

       2.    No Plaintiff Has Adequately Alleged Antitrust
          Injury........................................................ 39

**TABLE OF CONTENTS**

B.  Plaintiffs Have Not Alleged Any Plausible Conspiracy ........................................................... 40

III.  THE DISTRICT COURT CORRECTLY DISMISSED DENNIS'S CEA CLAIMS ............................................. 44

A.  The District Court Correctly Held that Dennis Failed to Adequately Allege Specific Intent. ............................... 44

1.  Dennis Failed to Allege that Defendants Specifically Intended to Manipulate the Price of Sterling FX Futures .................................. 46

2.  Dennis Failed to Allege Specific Intent to Manipulate the Commodity Underlying Sterling FX Futures. ............................................. 47

a.  Sterling—Not Sterling LIBOR—Is the Commodity Underlying Sterling FX Futures. ................................. 48

b.  Plaintiffs' Allegations Regarding Intent to Manipulate Sterling LIBOR Are Unavailing. ......................................... 49

c.  Dennis Fails to Plead Specific Intent to Manipulate Sterling. ............................. 50

B.  Plaintiffs Also Failed to Allege That Dennis Suffered Actual Damages. ............................................... 52

C.  Dennis's CEA Claim Is Impermissibly Extraterritorial. ................................................ 56

D.  Dennis's CEA Claims Are Time-Barred. .......................... 60

CONCLUSION ............................................................................ 63

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*,
    771 F.App'x 498 (2d Cir. 2019) ................................................................31, 33

*Advanced Magnetics, Inc. v. Bayfront Partners*,
    106 F.3d 11 (2d Cir. 1997) ..................................................................................26

*Alaska Dep't of Revenue, Treasury Div. v. Manku*,
    2021 WL 3027170 (2d Cir. 2021) .....................................................................43

*In re Aluminum Warehousing Antitrust Litig.*,
    833 F.3d 151 (2d Cir. 2016) ...............................................................................28

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
    19 F.4th 127 (2d Cir. 2021) ..........................................................................29, 37

*In re Amaranth Nat. Gas Commodities Litig.*,
    587 F.Supp.2d 513 (S.D.N.Y. 2008) ................................................................45

*In re Amaranth Nat. Gas Commodities Litig.*,
    730 F.3d 170 (2d Cir. 2013) ...................................................45, 46,  47, 53, 62

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
    671 F.3d 140 (2d Cir. 2011) ...............................................................................43

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of*
    *Carpenters*,
    459 U.S. 519 (1983)...........................................................................27, 29, 35

*Beazley Ins. Co., Inc. v. ACE Am. Ins. Co.*,
    880 F.3d 64 (2d Cir. 2018) .................................................................................20

*Blue Shield of Virginia v. McCready*,
    457 U.S. 465 (1982).............................................................................................31

*Cavello Bay Reinsurance Ltd. v. Shubin Stein*,
    986 F.3d 161 (2d Cir. 2021) ...............................................................................59

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018) ...............................................................5, 7, 33, 34

# TABLE OF AUTHORITIES

Page(s)

*Chevron Corp. v. Donziger*,
    990 F.3d 191 (2d Cir. 2021) ...............................................................18

*In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*,
    435 F.Supp.3d 845 (N.D. Ill. 2020) ....................................................56

*China Agritech, Inc. v. Resh*,
    138 S. Ct. 1800 (2018) ........................................................................24

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*,
    560 F.App'x 84 (2d Cir. 2014) ...........................................45, 46, 47

*Consarc Corp. v. Marine Midland Bank, N.A.*,
    996 F.2d 568 (2d Cir. 1993) ...............................................................25

*In re Cooperatieve Centrale Raiffeisen Boerenleenbank B.A.*,
    CFTC No. 14-02, 2013 WL 5872872 (Oct. 29, 2013) ...................8, 51

*Copperweld Corp. v. Indep. Tube Corp.*,
    467 U.S. 752 (1984).............................................................................42

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*,
    790 F.3d 411 (2d Cir. 2015) .........................................................25, 26

*Credit Suisse Sec. (USA) LLC v. Billing*,
    551 U.S. 264 (2007).............................................................................24

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    801 F.3d 758 (7th Cir. 2015) ........................................................48, 49

*Daniel v. Am. Bd. of Emergency Med.*,
    428 F.3d 408 (2d Cir. 2005) .........................................................27, 28

*Dennis v. JPMorgan Chase & Co.*,
    342 F.Supp.3d 404 (S.D.N.Y. 2018) ..................................................26

*In re Deutsche Bank AG*,
    CFTC No. 15-20, 2015 WL 1874880 (Apr. 23, 2015)........................51

# TABLE OF AUTHORITIES

Page(s)

*In re Elevator Antitrust Litig.,*
502 F.3d 47 (2d Cir. 2007) .................................................................42

*Est. of Clark v. Companion Life Ins. Co.,*
712 F.App'x 113 (2d Cir. 2018) ........................................................19

*Fed. Ins. Co. v. Am. Home Assur. Co.,*
639 F.3d 557 (2d Cir. 2011) ..............................................................19

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.,*
2017 WL 3600425 (S.D.N.Y. Aug. 17, 2017)...................................35

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.,*
No. 16-cv-5263, ECF 230...................................................................13

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.,*
991 F.3d 370 (2d Cir. 2021) ........................................................passim

*Fund Liquidation Holdings LLC v. Citibank, N.A.,*
399 F.Supp.3d 94 (S.D.N.Y. 2019) ............................................19, 21

*Gatt Comms., Inc. v. PMC Assocs., L.L.C.,*
711 F.3d 68 (2d Cir. 2013) ................................................................28

*Gelboim v. Bank of Am. Corp.,*
823 F.3d 759 (2d Cir. 2016) .......................................................passim

*Greenfield v. Philles Records Inc.,*
98 N.Y.2d 562 (2002) ........................................................................25

*Halliburton Co. v. Erica P. John Fund, Inc.,*
573 U.S. 258 (2014)......................................................................20, 24

*Harry v. Total Gas & Power North America, Inc.,*
889 F.3d 104 (2d Cir. 2018) .......................................................passim

*Hershey v. Energy Transfer Partners, L.P.,*
610 F.3d 239 (5th Cir. 2010) .........................................48, 49, 50, 53

*Hugo Boss Fashions, Inc. v. Fed. Ins. Co.,*
252 F.3d 608 (2d Cir. 2001) ..............................................................20

vii

# TABLE OF AUTHORITIES

Page(s)

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
924 F.3d 57 (2d Cir. 2019) ....................................................................36, 37, 38

*John Wiley & Sons v. DRK Photo*,
882 F.3d 394 (2d Cir. 2018) ...............................................................................23

*Laydon v. Mizuho Bank, Ltd.*,
2020 WL 5077186 (S.D.N.Y. Aug. 27, 2020)....................................................58

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) .........................................................................48, 55

*Levy v. BASF Metals Ltd.*,
917 F.3d 106 (2d Cir. 2019) ...............................................................................61

*Lexmark International, Inc v. Static Control Components, Inc.*,
572 U.S. 118 (2014)............................................................................................37

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
935 F.Supp.2d 666 (S.D.N.Y. 2013) .......................................................24, 48, 49

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
962 F.Supp.2d 606 (S.D.N.Y. 2013) ...............................................49, 53, 54, 56

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
27 F.Supp.3d 447 (S.D.N.Y. 2014) ....................................................................55

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015).....................................................42

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
2016 WL 1558504 (S.D.N.Y. Apr. 15, 2016) ....................................................54

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ..............................................29, 36

*In re Lloyds Banking Grp. plc and Lloyds Bank plc*,
CFTC No. 14-18, 2014 WL 3783951 (July 28, 2014) .......................................51

*Lipsky v. Commonwealth United Corp.*,
551 F.2d 887 (2d Cir. 1976) .................................................................................9

# TABLE OF AUTHORITIES

Page(s)

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
332 F.Supp.3d 885 (S.D.N.Y. 2018) ........................................................54, 55

*Mandala v. NTT Data, Inc.*,
975 F.3d 202 (2d Cir. 2020) ...............................................................33

*Masters v. Wilhelmina Model Agency, Inc.*,
473 F.3d 423 (2d Cir. 2007) ...............................................................23

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013) ...............................................................41

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
547 U.S. 71 (2006).............................................................................20

*In re Merrill Lynch & Co., Research Reports Sec. Litig.*,
218 F.R.D. 76 (S.D.N.Y. 2003) .............................................................9

*In re Mexican Gov't Bonds Antitrust Litig.*,
412 F.Supp.3d 380 (S.D.N.Y. 2019) .................................................44

*Morrison v. Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010).........................................................................59

*In re Nortel Networks Corp. Sec. Litig.*,
539 F.3d 129 (2d Cir. 2008) ...............................................................50

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
763 F.3d 198 (2d Cir. 2014) .................................................57, 58, 59

*In re Platinum & Palladium Antitrust Litig.*,
2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017)...................................55

*In re Platinum & Palladium Commodities Litig.*,
828 F.Supp.2d 588 (S.D.N.Y. 2011) ................................................8

*Prime International Trading v. BP P.L.C.*,
937 F.3d 94 (2d Cir. 2019) ..........................................................*passim*

*S&A Farms, Inc. v. Farms.com, Inc.*,
678 F.3d 949 (8th Cir. 2012) ...........................................................52

ix

# TABLE OF AUTHORITIES

Page(s)

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
No. 17-2381, 2021 WL 6143556 (2d Cir. Dec. 30, 2021) ..........................*passim*

*Set Cap. LLC v. Credit Suisse Grp. AG*,
996 F.3d 64 (2d Cir. 2021) .................................................................20

*Sonterra Cap. Master Fund Ltd. v. UBS AG*,
954 F.3d 529 (2d Cir. 2020) ...............................................................35

*In re SSA Bonds Antitrust Litig.*,
2020 WL 1445783 (S.D.N.Y. Mar. 25, 2020) ............................................40, 41

*Sunbelt Rentals, Inc. v. Charter Oak Fire Ins. Co.*,
839 F.Supp.2d 680 (S.D.N.Y. 2012) .................................................21

*Three Crown Ltd. P'ship v. Caxton Corp.*,
817 F.Supp. 1033 (S.D.N.Y. 1993) ...........................................48, 50

*U.S. Tr. Co. of N.Y. v. Jenner*,
168 F.3d 630 (2d Cir. 1999) ...............................................................24

*United States v. Phila. Nat'l Bank*,
374 U.S. 321 (1963).............................................................................24

*Zirvi v. Flatley*,
838 F.App'x 582 (2d Cir. 2020) .......................................................61

x

# TABLE OF AUTHORITIES

Page(s)

**Statutes**

7 U.S.C. § 1a ....................................................................................45

7 U.S.C. §25(a)(1) ............................................................................52

7 U.S.C. § 25(a)(1)(D) ................................................................45, 47

7 U.S.C. § 25(c) ...............................................................................60

**Other Authorities**

Fed. R. Civ. P. 8(a) ..........................................................................45

Fed. R. Civ. P. 9(b) ..........................................................................45

Fed. R. Civ. P. 17(a)(3) ...............................................................13, 14

# United States Court of Appeals
# for the Second Circuit

———————————

## No. 19-2979

———————————

SONTERRA CAPITAL MASTER FUND V. BARCLAYS BANK PLC

———————————

Appeal from the United States District Court for the
Southern District of New York

———————————

**JOINT BRIEF FOR DEFENDANTS-APPELLEES**

———————————

## INTRODUCTION

This is an appeal from the dismissal of claims accusing Defendants of conspiring to manipulate British Pound Sterling LIBOR, a benchmark interest rate. Three plaintiffs—two investment funds dissolved years before suit was filed and an individual alleging a single purchase and sale of futures contracts—brought antitrust and other claims against seven defendants, including five members of the Sterling LIBOR contributor panel, purportedly on behalf of a class of investors. The district court (Broderick, J.) dismissed the action after concluding that Plaintiffs failed to state a cognizable claim for relief and that a dissolved fund's claims were outside the scope of its assignment agreement with a proposed new plaintiff.

Indiscriminately lumping this case together with other "LIBOR-related cases" (Br.2) involving different benchmark rates, fact patterns, and procedural postures, Plaintiffs elide the yawning gaps in their legal theories and pleadings that compelled dismissal.

*First*, the district court correctly dismissed the claims of plaintiff FrontPoint European Fund L.P. ("FrontPoint"), which dissolved years before this suit was brought in its name and therefore lacked Article III standing or capacity to sue. *See Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 386 (2d Cir. 2021) ("*SIBOR III*"). The district court properly rejected FrontPoint's attempt to substitute its supposed assignee Fund Liquidation Holdings, LLC ("FLH") because the FrontPoint-FLH assignment contained an explicit "limitation to securities class actions," *id.* at 392 n.15, which excludes this action.

*Second*, the district court faithfully applied this Court's "efficient enforcer" jurisprudence in concluding that the two other named plaintiffs, Sonterra Capital Master Fund, Ltd. ("Sonterra") and Richard Dennis, lacked antitrust standing. Unlike FrontPoint, neither claimed to have transacted with any alleged conspirator. Consequently, and as this Court recently made clear, neither Sonterra nor Dennis alleged "an antitrust injury *that was proximately caused* by Defendants' alleged conspiracy." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 2021 WL 6143556, at *5 (2d Cir. Dec. 30, 2021) ("*Schwab II*"). Indeed, their claim

is considerably more remote than those rejected in *Schwab II* because the Sterling foreign exchange forwards and futures contracts Sonterra and Dennis allegedly traded "do not reference" Sterling LIBOR, rendering their antitrust standing theory "clearly insufficient." *Id.* at *8 n.6.

This Court can also affirm the dismissal of Plaintiffs' antitrust claims on either of two alternative grounds: (1) Plaintiffs' failure, given their episodic, up-and-down theory of LIBOR manipulation, to offer any plausible allegations of antitrust injury that could pass muster under *Harry v. Total Gas & Power North America, Inc.*, 889 F.3d 104, 116 (2d Cir. 2018) ("*Harry*"); and (2) Plaintiffs' failure to plausibly allege an antitrust conspiracy, given their sole reliance on government settlements lacking any admissions, or even assertions, of interbank collusion regarding Sterling LIBOR.[1]

*Third*, the district court appropriately dismissed Dennis's claims under the Commodity Exchange Act ("CEA")—the only other claims that Plaintiffs have not abandoned—for failure to plead any facts suggesting that Defendants' purported conduct was directed at manipulating Sterling FX futures. Dennis also failed to allege "actual damages" as the CEA requires, and his claims are impermissibly extraterritorial and untimely.

The Court should affirm.

---

[1] As to UBS AG ("UBS"), this issue is addressed in UBS's cross-appeal.

## STATEMENT OF THE ISSUES

1.     Whether the district court properly held that an assignment agreement expressly limited to the right to participate in "securities class action lawsuits" failed to assign the right to bring antitrust claims.

2.     Whether the district court properly held that Sonterra and Dennis—umbrella purchasers that did not transact with any alleged conspirator, or in instruments indexed to LIBOR—lacked antitrust standing.

3.     Alternatively, whether the district court's dismissal of Plaintiffs' antitrust claims should be affirmed for failure to plead antitrust injury or a plausible conspiracy.

4.     Whether the dismissal of Dennis's CEA claims should be affirmed for failure to plead either specific intent, actual damages, a domestic application of the law, or a timely claim.[2]

---

[2] In the district court, Defendants argued that personal jurisdiction was lacking—an issue the district court resolved only as to UBS, and which UBS addresses in its cross-appeal.  SA55.  Defendants continue to object to personal jurisdiction, and respectfully reserve the right to renew that objection in case of remand.

## COUNTER-STATEMENT OF THE CASE

### A.  Sterling LIBOR

"LIBOR is a set of . . . benchmark interest rates that approximate the average rate at which major banks can borrow money." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 78 (2d Cir. 2018) ("*Schwab I*").  During the relevant period (2005-10), LIBOR was administered by the British Bankers' Association ("BBA"). *Id*.; JA39, 71(Consolidated Amended Complaint ("Complaint" or "CAC")¶¶8, 91). Separate LIBOR rates, set by different panels of banks, were calculated in London for various currencies, including British pounds sterling ("Sterling").

Sterling LIBOR was calculated as follows: (1) the BBA asked panel banks to answer the hypothetical question "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?" and (2) "published rates . . . were pegged to the mean of 16 panel members' quotes, after excluding the four highest and four lowest submissions." *Schwab I*, 883 F.3d at 78; JA81-82(CAC¶¶116-17).  Each panel member submitted "quotes for 15 tenors, ranging from overnight to twelve months." JA81-82(CAC¶116).

## B. Defendants and Their Alleged Conduct

Five defendants were members of the Sterling LIBOR contributor panel at the relevant time;[3] the other two were affiliates of panel banks.[4]  JA72(CAC¶118); SA7. Plaintiffs alleged in conclusory terms that over a six-year period, "Defendants coordinated their Sterling LIBOR submissions" (JA89(CAC¶125)), without identifying a single instance of such coordination or any communications evidencing such collusion.

Instead, Plaintiffs alleged that on various occasions, a trader employed by one defendant asked a Sterling LIBOR submitter employed by the same defendant to submit either a high or low rate for a particular tenor of Sterling LIBOR on a particular date or set of dates, in an attempt to benefit a position that the requesting employee had taken for that same defendant in an instrument priced according to a given day's published LIBOR.  *E.g.*, JA83-84, 90-95(CAC¶¶120, 128-137).  Such attempted manipulation was intended only to "financially benefit [the traders'] Sterling LIBOR-based derivative positions" (JA92(CAC¶133)), so it was, by definition, date-specific, tenor-specific, and bi-directional (*i.e.*, sometimes high, sometimes low, depending on the trader's needs—*see* JA142(CAC¶238) (alleging

---

[3] Barclays Bank PLC ("Barclays"), Deutsche Bank AG ("Deutsche Bank"), Rabobank, The Royal Bank of Scotland plc (n/k/a NatWest Markets plc) ("RBS"), and UBS.

[4] Lloyds Banking Group plc ("LBG") and Barclays Capital Inc. ("BCI").

that defendants conspired to "suppress, *inflate*, maintain, or *otherwise alter* Sterling LIBOR") (emphasis added), JA94-95(CAC¶136 (alleging that a trader wanted high 1-month and low 3-month Sterling LIBOR submission)). That theory is entirely different than the one previously considered by the Court in the U.S. Dollar context. *Compare Schwab I*, 883 F.3d at 78 (describing allegations that USD LIBOR was continuously "artificially suppressed" by banks "understating their true borrowing costs" to burnish their reputations).

The Complaint incorporated by reference (SA7-8) settlement agreements that Defendants separately entered into with governmental entities, including the Department of Justice, the Commodity Futures Trading Commission ("CFTC"), and the United Kingdom's Financial Conduct Authority ("FCA") (or its predecessor, the Financial Services Authority), following extensive investigations. *See* JA40-41(CAC¶11). These settlement documents do not refer to any instances of inter-defendant collusion with respect to Sterling LIBOR, much less the overarching multi-bank conspiracy posited by Plaintiffs. At most, these documents reference unilateral attempts to manipulate Sterling LIBOR on certain occasions to benefit particular trading positions, and that a Sterling LIBOR submitter at one bank occasionally discussed LIBOR submissions with brokers.[5]

---

[5] Plaintiffs concede there were no regulatory allegations of Sterling LIBOR manipulation as to RBS. JA47(CAC¶24).

## C. Plaintiffs

Plaintiffs are two long-defunct investment firms and an individual trader.

***Sonterra***. Sonterra was an investment fund that dissolved in 2012, *see SIBOR III*, 991 F.3d at 376; JA271, two and one-half years before this action was commenced in its name. JA12. Sonterra did not allege that it transacted in any Sterling LIBOR-based instruments with any Defendants. Instead, Sonterra allegedly transacted with third parties in Sterling foreign-exchange ("FX") forwards, which Plaintiffs define as "[a] transaction that *solely* involves the exchange of two different currencies on a specific future date at a fixed rate agreed upon at the inception of the contract covering the exchange." JA87(CAC¶121(e)) (emphasis added); *see also* JA128(CAC¶206) ("A foreign exchange forward is an agreement to buy or sell a certain amount of one currency, *e.g.*, Sterling, in terms of another, *e.g.*, U.S. Dollars, on some future date").

Not surprisingly, Sonterra did not allege that any payments on these FX forwards were indexed to Sterling LIBOR. Nor did Sonterra allege that Sterling LIBOR was incorporated as a term or otherwise referenced in its (or anyone's) FX forwards. [6] Rather, Sonterra alleged only that certain (unidentified) market

---

[6] The CFTC did not, as Plaintiffs claim (Br.18), find otherwise; the cited consent order (JA84-85(CAC¶121)) merely includes "foreign exchange forwards" in a list

8

participants, in making their own independent decisions whether to buy or sell forward contracts, "determined" for themselves "the cost of buying or selling Sterling under a [FX] forward" by "using a formula that incorporates Sterling LIBOR," specifically "to calculate the cost of carrying Sterling over the duration of the" forward contract. JA128(CAC¶206). Sonterra did not identify this "formula," explain how or by what mechanism "it incorporates Sterling LIBOR," state how (or whether) a trader's "cost of carry" affected the value of its FX forward contracts, or even allege that *it* used the "formula" in making its own investment decisions.

Indeed, Sonterra alleged no information whatsoever about its own supposed FX forward transactions, alleging no transaction dates, prices or amounts, counterparties, the currency in which the Sterling FX forward contracts were priced (*e.g.*, USD or Euros), or any other details. Sonterra merely offered the generic and conclusory allegation that it transacted at "artificial" prices. JA134-35(CAC¶216).

***Dennis***. Dennis allegedly bought and sold Sterling FX futures contracts on the Chicago Mercantile Exchange ("CME") on one occasion, opening and closing

---

of products traded by Rabobank employees. *See In re Cooperatieve Centrale Raiffeisen Boerenleenbank B.A.*, CFTC No. 14-02, 2013 WL 5872872, at *4 (Oct. 29, 2013) ("*Rabobank*"). In all events, "Second Circuit case law makes it clear that references to . . . administrative proceedings that did not result in an adjudication on the merits . . . are, as a matter of law, immaterial under Rule 12." *In re Merrill Lynch & Co., Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003); *see also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893–94 (2d Cir. 1976).

his position over two days. JA133-34(CAC¶214). Like Sonterra, Dennis did not allege that he transacted with any Defendant.

Dennis alleged that "[e]ach [Sterling FX Futures] contract is an agreement to buy or sell £62,500, in terms of U.S. Dollars, on some future date." JA131(CAC¶212). The Sterling FX Futures contract specifications published by the CME and incorporated by reference in the Complaint (JA74(CAC¶98&n.42)) identify the "Contract Unit" for Sterling FX Futures as "62,500 British pounds" and the "Price Quotations" as "U.S. dollars and cents per GBP increment."[7] The Complaint also asserted that Sterling FX futures are "identical to" Sterling FX forwards "except that [Sterling FX forwards] are not traded on an exchange and thus not subject to the standardized terms specified by the CME." JA132(CAC¶212).

Dennis did not allege that the prices he paid or received for the futures were indexed or tied to Sterling LIBOR, or that Sterling LIBOR was incorporated as a term or otherwise referenced in his futures contracts. And the CME contract specifications contain no reference to Sterling LIBOR at all (whether as an element of pricing, settlement, or otherwise). Instead, Dennis fell back on an the same "carrying cost" allegation that Sonterra made about Sterling FX forwards. JA131-32(CAC¶212).

---

[7] *See* https://www.cmegroup.com/markets/fx/g10/british-pound.contractSpecs.html# (contract unit is £62,500 and price quotation is "U.S. Dollars and Cents per GBP increment").

Dennis alleged that he acquired a "long position" in CME Sterling FX futures on May 11, 2010 and "liquidated" it two days later, losing approximately $38,000. JA133(CAC¶214). Dennis did not allege any manipulation of Sterling LIBOR on May 11-13, 2010, or in the ten preceding months. Indeed, Dennis did not allege anything about Sterling LIBOR on the dates he traded, including how (if at all) it moved in that short window (*i.e.*, up or down), or how any such movement impacted, let alone harmed, his "long position."

***FrontPoint***. The CAC alleged that FrontPoint, a Delaware limited liability company that (like Sonterra) dissolved in 2012 (JA315-22), entered into "Sterling LIBOR-based swaps" with UBS on three occasions in 2007, with payments on those swaps ceasing by 2008. JA131(CAC¶211).

On July 13, 2011, FrontPoint and certain related entities entered into a New York law-governed Asset Purchase Agreement ("APA") with FLH, a Delaware limited liability company. JA268, 282-309. The APA's self-evident purpose was to transfer to FLH FrontPoint's right to participate in securities class action settlements. For $1,000, FrontPoint assigned to FLH any "right, title and interest" in its "Assets," defined as the sellers' "Recovery Rights" in certain "Existing Claims" and "Future Claims." JA 282, 283, 297 (APA§§1.1, 1.2, art. 2 and Schedule II). As relevant here, "Future Claims" were defined as certain claims "arising out of" either "any future securities class action lawsuit or any Judgment thereon" or "any future

holdbacks or reserves under any settled securities class action lawsuit or any Judgment thereon," in each case provided the "securities class action lawsuit" related to FrontPoint's ownership or transactions in defined "Included Securities." JA284(APA art. 2). Expressly excluded from the definition of "Future Claims" were any "Recovery Rights" arising from "state or federal common law claim[s], [or] any non-securities-related claim[s]." *Id.*

On March 9, 2012—nearly four years before a complaint in this action was filed in its name—FrontPoint filed a Certificate of Cancellation with the Delaware Secretary of State, ceasing to be a Delaware company and eliminating its capacity to sue. JA271-273, 315-322.

## D. Procedural History

An initial complaint, solely in Sonterra's name, was filed on May 6, 2015. After Defendants moved to dismiss it, a second action was commenced in January 2016, in the names of FrontPoint and Dennis, and the district court consolidated the two cases. The Complaint, filed in February 2016, advanced claims under the Sherman Act, CEA, RICO, and state law. SA3. Plaintiffs purported to sue on behalf of a putative class of "[a]ll persons or entities that engaged in "U.S.-based transactions in financial instruments that were priced, benchmarked, and/or settled based on Sterling LIBOR" from January 1, 2005 through December 31, 2010." JA136(CAC¶221).

In April 2016, Defendants moved to dismiss the CAC.  In October 2017, after oral argument on that motion, Defendants' counsel discovered that Sonterra and FrontPoint had both been dissolved in 2012, contradicting the representation in the CAC (and all three prior complaints) that Sonterra and FrontPoint were both going concerns with capacity to sue.  JA55(CAC¶¶37-38).  Defendants became aware of these dissolutions after an amended complaint involving related entities (represented by the same counsel as in this case) alleged for the first time that "[d]uring a substantial part of the Class Period, Plaintiff FrontPoint . . . *was* an investment fund with its principal place of business in Greenwich, Connecticut."  *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16-cv-5263, ECF 230 ¶81 (S.D.N.Y. Sept. 18, 2017) (emphasis added).  After further investigation, Defendants' counsel raised with Plaintiffs' counsel their Rule 11 obligation to correct the false allegations in the Complaint and related deficiencies.  JA268-74.  Plaintiffs' counsel responded by asking the district court for permission to file a "motion to substitute [FLH] under Fed. R. Civ. P. 17(a)(3)" and a "corrected amended complaint reflecting the substance of the substitution."  JA268.

The district court held that request in abeyance pending decision on Defendants' motion to dismiss.  JA275.  Judge Broderick later issued two orders, which together dismissed the case in full.

***The 2018 Order.*** On December 21, 2018, the district court granted Defendants' motion to dismiss all claims except FrontPoint's antitrust and unjust enrichment claims against UBS, its alleged counterparty. SA1-68.

Judge Broderick held that Sonterra and Dennis were not "efficient enforcers" and therefore lacked antitrust standing, for several reasons: they asserted "exactly the sort of 'umbrella claims' that [this Court previously] viewed with skepticism"; the alleged relationship between Sterling LIBOR and the prices of their Sterling FX forwards and futures was "attenuated"; and their damages were not "plausibly allege[d]." SA30-34. The court found that FrontPoint was an efficient enforcer, and sufficiently alleged an antitrust conspiracy, solely as to UBS; the court did not analyze Plaintiffs' conspiracy allegations as to the other Defendants. SA38-39.

As to the CEA, Judge Broderick noted that FrontPoint and Sonterra abandoned their claims, and Dennis conceded that his claims against Barclays, UBS, and RBS were time-barred. SA19. The court concluded that although Dennis sufficiently alleged CEA standing as to the remaining Defendants, SA42-44, he failed to plausibly allege specific intent to manipulate Sterling FX futures; Dennis's generalized assertions of Defendants' alleged motive to "profit" from manipulation were insufficient. SA44-45. The district court did not address Defendants' argument that Dennis failed to allege a "domestic" application of the CEA.

The court also dismissed Plaintiffs' RICO claims as impermissibly extraterritorial, their state-law unjust enrichment claim against Defendants other than UBS for failure to plead any direct relationship, and their claims against BCI for failure to plausibly allege any wrongdoing. SA49-55. Finally, the district court directed FrontPoint to "file any motion to substitute pursuant to Rule 17(a)(3), limited in scope to the surviving claims." SA68. Given the dismissal of its claims, Sonterra's substitution request was deemed moot. SA73n.6.

**The 2019 Order**. FrontPoint moved to substitute FLH, and on August 16, 2019, the district court denied that motion because the "APA did not assign to FLH the right to bring either the Sherman Act claims or the common law unjust enrichment claim at issue here." SA70, 74. Judge Broderick explained that the APA assigned only claims relating to "securities class action lawsuit[s]," not a "non-securities related claim" like FrontPoint's antitrust claim, and expressly excluded "common law claim[s]" like FrontPoint's unjust enrichment claim. *See* SA76-82. As long-dissolved FrontPoint concededly lacked capacity to sue, the district court dismissed the remaining claims in their entirety. SA83-86.

This appeal followed.

## SUMMARY OF THE ARGUMENT

I.     The Court should affirm the denial of FrontPoint's substitution motion and dismissal of its claims.  Plaintiffs do not dispute that FrontPoint, which dissolved before the suit was filed, lacked standing or capacity.  And the APA unambiguously transferred to FLH only FrontPoint's rights to participate in "*securities class action lawsuits*."  It did *not* assign FLH the right to bring antitrust litigation (or indeed any litigation) in its own name, or to participate in any "non-securities related claim" or "common law claim."  Plaintiffs' attempt to re-write "securities class action lawsuits" into "putative class action lawsuits of any type" is belied by the APA's plain language, and their resort to extrinsic evidence to explain unambiguous contractual terms is impermissible.  In any event, the proposed substitution was inconsistent with Rule 17(a)'s requirements.

II.     The Court should affirm the dismissal of Plaintiffs' antitrust claims. Sonterra and Dennis plainly lack antitrust standing under *Schwab II*.  They did not transact with any Defendant, so their alleged injuries could not have been proximately caused by Defendants, and their claims are impermissibly remote.  They also lack antitrust standing because they did not transact in any "LIBOR-based" instrument, but rather only in FX products that did not incorporate or reference Sterling LIBOR.  *Schwab II* further confirmed that the district court properly rejected Plaintiffs' attempt to manufacture a vague, attenuated LIBOR connection by

claiming that unidentified traders (but not Plaintiffs themselves) somehow used Sterling LIBOR in an unspecified "formula" to determine whether to trade FX forwards and futures.

Affirmance is also required as to all Plaintiffs because none plausibly alleged antitrust injury. *Harry* requires an antitrust plaintiff positing episodic, up-and-down manipulation to allege facts supporting a plausible inference that the plaintiff was harmed—not benefited—by the price changes. Plaintiffs alleged none.

Affirmance is further warranted because Plaintiffs pleaded no plausible antitrust conspiracy. The government settlements on which they exclusively rely do not support the existence of an interbank Sterling LIBOR conspiracy. Plaintiffs' conclusory pleading based on their aggressive overreading of those settlements contravenes *Twombly*.

III.    Affirmance of the dismissal of Dennis's CEA claims is warranted on any of four independent grounds: (1) the district court correctly held that Dennis failed to make the necessary allegations of specific intent; (2) Dennis failed to allege "actual damages" under *Harry*; (3) Dennis's claims were impermissibly extraterritorial under *Prime International Trading v. BP P.L.C.*, 937 F.3d 94 (2d Cir. 2019) ("*Prime*"); and (4) Dennis's claims were time-barred.

# ARGUMENT

## I. THE DISTRICT COURT CORRECTLY DISMISSED FRONTPOINT'S CLAIMS AND DENIED SUBSTITUTION OF FLH AS PLAINTIFF.

Plaintiffs do not and cannot contend that FrontPoint, which dissolved in 2012, itself had standing or capacity to bring this lawsuit. *See SIBOR III*, 991 F.3d at 386 ("[A] plaintiff corporation or partnership must have legal existence to have constitutional standing"). Instead, Plaintiffs argue only that FLH should be permitted to pursue FrontPoint's antitrust claim because FrontPoint supposedly assigned that claim (but not its unjust enrichment claim) to FLH. Br.46-53.[8] The district court correctly found otherwise. And even if FrontPoint had effectively assigned its antitrust claim, Rule 17 does not authorize substitution in the circumstances of this case.

### A. FLH Could Not Assert FrontPoint's Antitrust Claim Because the APA Did Not Assign Such Claims to FLH.

The APA on its face assigned to FLH potential recoveries arising from securities class action lawsuits, but not (as Plaintiffs contend) the right to bring *antitrust* claims.

1. As Judge Broderick correctly observed, the APA says nothing about assigning antitrust claims. SA77. Its assignment of "Future Claims"—*i.e.*, claims

---

[8] Plaintiffs have accordingly abandoned any challenge to the dismissal of FrontPoint's unjust enrichment claim. *See, e.g.*, *Chevron Corp. v. Donziger*, 990 F.3d 191, 203 (2d Cir. 2021).

owned by FrontPoint that had not yet been filed—is expressly limited, as relevant here, to those rights to recover from a settlement or judgment "arising out of . . . *any future securities class action lawsuit[s]* or any Judgment thereon to the extent related to [FrontPoint's] ownership of, or any transaction in, any Included Securities." JA284-85 (emphasis added). Underscoring this point, the definition of "Future Claims" contains this unambiguous exclusion: "Future Claims do not include Recovery Rights in respect of . . . any non-securities related claim . . . ." JA284. The APA thus plainly assigned *only* rights to recover arising from securities class actions; non-securities claims were excluded. *See Fund Liquidation Holdings LLC v. Citibank, N.A.*, 399 F.Supp.3d 94, 102-03 (S.D.N.Y. 2019) ("*SIBOR II*") (ruling that the terms of the APA "are unambiguous on their face" and do "not assign [antitrust] claims"); *see also SIBOR III*, 991 F.3d at 392 n.15 (describing the APA as containing a "limitation to securities class actions").

Well-settled canons of construction confirm that conclusion. New York courts construe terms in a contract in accordance with their plain and ordinary meaning. *See Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation." *Est. of Clark v. Companion Life Ins. Co.*, 712 F.App'x 113, 114 (2d Cir. 2018) (summary order) (cleaned up). Because "securities class action lawsuit" was not defined in the

APA, its plain and ordinary meaning must apply. As Judge Broderick explained, "a 'securities class action lawsuit' is commonly understood to refer to a lawsuit litigated as a class action based on alleged violations of the securities laws—namely (in the federal context) the Securities Act of 1933 and the Securities Exchange Act of 1934." SA78. This common, unambiguous understanding is not merely what "some U.S.-based litigators might understand." Br.49. Rather, it aligns precisely with the consistent usage of the Supreme Court and this Court.[9] And "where contracting parties use terms and concepts that are firmly rooted in federal law"—such as securities class action lawsuit—"and where there are no explicit signals to the contrary, we can presume that the prevailing federal definition controls." *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 618 (2d Cir. 2001); *see also Beazley Ins. Co., Inc. v. ACE Am. Ins. Co.*, 880 F.3d 64, 69 (2d Cir. 2018) ("[S]ecurities law is 'paradigmatically a federal field'") (quoting *Hugo Boss*, 252 F.3d at 618).

The district court thus correctly rejected Plaintiffs' invitation to read "securities class action lawsuit" to encompass *any* kind of class action lawsuit, so

---

[9] *See, e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 264 (2014) (using "securities class action cases" to refer to cases arising from laws such as "section 10(b) of the Securities Exchange Act of 1934"); *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 68 (2d Cir. 2021) (plaintiffs "[bring] this securities class action lawsuit" under the Securities Act of 1933 and the Securities Exchange Act of 1934); *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 82 (2006) (discussing Congress' desire to limit "securities class action lawsuits").

long as it involves products defined as "Securities" in the APA. SA77; *see* Br. 46-48. The phrase "securities class action lawsuit[s]," within the definition of "Future Claims," does not use a capitalized-S "Securities," and that choice—made by sophisticated Delaware-incorporated investment funds—must be respected. As Judge Broderick explained, "the APA's extensive use of defined terms demonstrates that its drafters were perfectly capable of using such terms when they wished to do so." SA80; *see also SIBOR II*, 399 F.Supp.3d at 103 ("While the broadly delimited term 'Securities' is explicitly defined by the APA, the lowercase-s 'securities class action' and 'non-securities related claim' used to define Future Claims are not."); *Sunbelt Rentals, Inc. v. Charter Oak Fire Ins. Co.*, 839 F.Supp.2d 680, 688–89 (S.D.N.Y. 2012) (distinguishing "equipment" from defined term "Equipment" in rental agreement).

The context also confirms that the choice of "securities" over "Securities" was deliberate: the very sentence in which the term "securities class action" appears *also* includes the defined term "Included Securities." JA284 (defining "Future Claims" to mean "Recovery Rights related to . . . *Included Securities* . . . as to which no Case has been filed . . . arising out of[] any *securities class action lawsuit* . . . ."). It follows that the drafters' "decision not to capitalize the 's' in 'securities class action' or to specifically define 'securities class action lawsuit' should not be ignored and

the term should therefore be accorded its ordinary meaning, which does not encompass antitrust claims." SA80.

2. In the face of this straightforward analysis, Plaintiffs present a grab bag of convoluted arguments. None survives scrutiny.

Plaintiffs contend that FrontPoint assigned to FLH *all* claims relating to swap transactions because the definition of "Securities" in the APA includes "swaps," and because "Included Securities" are defined as "Securities" in the "Trade Data" to be provided to FLH. Br.47-48; JA284-85. But the pertinent question is not whether the APA defines "swaps" as "Securities." That is because the APA provides that only "*certain of*"—not all—"such trades in Securities . . . may or may not give rise to Recovery Rights and Claims," namely those trades for which claims have been or will be made "arising out of . . . *securities class action lawsuit[s]*." JA282 (Second "Whereas" Clause), 284 ("Future Claims") (emphasis added). Put another way, the definitions of "Securities" and "Included Securities" do not define the *types of claims* that are assigned. Rather, they merely delineate which transactions are the subject of the "Trade Data" that is "to be provided" to FLH relating to the defined set of "Included Securities" that could *potentially* give rise to recovery via a "securities class action lawsuit." JA282, 284-285; *see* JA288 (APA §5.1) (providing for exchange of Trade Data so that FLH can "verify and/or collect on the Assets or to satisfy information requests from Claims Administrators, Courts or attorneys

prosecuting any Claim or representing any Defendants or Potential Defendants").

Regardless of whether they involve "Securities," Plaintiffs' antitrust claims here still

involve no "securities class action lawsuit."[10]

Nor is there merit to Plaintiffs' contentions that the exclusion of "non-securities related claims" from assigned recovery rights entails an assignment of antitrust claims, or that "[a]n antitrust claim that *relates* to something (like a swap) that the APA itself defines as a '*Security*' can certainly be understood as a '*securities related* claim.'" Br.49. The APA did not assign capital-S "Securities related claims," much less exclude "non-Securities related claims." Once again, it assigned only that limited category of Recovery Rights that are "'*related* to . . . any transactions in[] any Included Securities . . . . *arising out of*' a 'securities class action lawsuit.'" JA284 (emphasis added). More generally, Plaintiffs' argument blurs the sharp distinction that Congress and this Court have drawn between antitrust and securities class actions. *See Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007) (explaining that the Private Securities Litigation Reform Act of 1995

---

[10] While Plaintiffs aver "[i]t would make no sense" to assign to FLH less than "all claims about . . . the Trade Data" (Br.50), they do not deny that the APA failed to assign non-securities or common law claims, including FrontPoint's (now-abandoned) unjust enrichment claim. It is not uncommon for parties, as here, to enter into assignments that effectuate less than a complete transfer of all claims held by the assignor. *E.g. John Wiley & Sons v. DRK Photo*, 882 F.3d 394, 413 (2d Cir. 2018).

("PSLRA") was "not applicable to antitrust class actions."[11] These separate laws serve different purposes: securities laws protect "the proper functioning of well-regulated capital markets," *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 276 (2007), while antitrust laws further "our fundamental [] economic policy" of competition, *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 372 (1963).[12]

      3.      Because there is no ambiguity on the face of the APA, Judge Broderick correctly "declin[ed] to consider" extrinsic evidence in the form of declarations proffered by plaintiffs. SA81; *contra* Br.50-52. "[W]here, as here, a contract is unambiguous, 'courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning.'" *U.S. Tr. Co. of N.Y. v. Jenner*, 168 F.3d 630, 632 (2d Cir. 1999) (refusing to consider affidavit

---

[11] As a result of the PSLRA and other federal legislation unique to securities class actions, they are litigated differently from other types of class actions. *See, e.g., China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1807-08 (2018) (discussing PSLRA's procedures for selecting lead plaintiffs in securities class actions); *Halliburton*, 573 U.S. at 277 (discussing PSLRA's "heightened pleading requirements, limits on damages and attorney's fees").

[12] It is telling that Plaintiffs also initially asserted RICO claims, even though "the PLSRA amended RICO to provide that 'no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR I*"), 935 F.Supp.2d 666, 726-31 (S.D.N.Y. 2013) (dismissing RICO claims regarding alleged USD LIBOR manipulation based on the PSLRA bar against securities fraud-related RICO claims). If Plaintiffs actually believed the case had anything to do with securities, they could not have pled RICO claims in good faith in this action.

supporting proposed reading) (quoting *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993)); *accord Greenfield v. Philles Records Inc.*, 98 N.Y.2d 562, 569 (2002).[13]

## B. Substitution Would Have Been Improper Under Rule 17(a).

Even if the APA had assigned to FLH the right to litigate FrontPoint's antitrust claim—and it did not—the proposed substitution of FLH for FrontPoint still would have been improper under Rule 17(a). Substitution of the "real party in interest" is permitted solely if, *inter alia*, (1) "the proposed amended complaint [seeks] only to substitute one name for another; the factual and legal allegations of the complaint would remain unaltered" and (2) "there [is] no indication of bad faith or an effort to deceive or prejudice defendants." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 422 (2d Cir. 2015) (quotation marks omitted). The opposite is true here.

First, substituting FLH for FrontPoint would require more than "substitut[ing] one name for another." The CAC does not once refer to FLH, the APA, or any

---

[13] Plaintiffs' reliance (Br.47) on the Notice of Assignment attached to the APA, JA307, does not advance their argument. Even if that document were operative and could change the plain meaning of the APA (which it cannot), the notice merely states that FrontPoint transferred to FLH the rights to recover in connection with "securities related claims related to or arising out of" FrontPoint's interest in certain instruments that the APA separately defines as "Securities." It does not, as Plaintiffs suggest, state that any claims relating to a capital-S "Security" have been transferred—and any such reading would render much of the APA and Notice superfluous.

assignment. At minimum, any amended pleading would have to include allegations regarding FrontPoint's dissolution, the APA, FLH's willingness to prosecute the action, and the circumstances surrounding FrontPoint's suing on FLH's behalf for years. Where, as here, a new plaintiff would have to "plead[] the existence of a new . . . assignment," the additional allegations would not be "merely formal," and substitution is improper. *Cortlandt*, 790 F.3d at 424. In another interest-rate benchmark case, Judge Kaplan denied the motion of one of FrontPoint's affiliates to substitute FLH, based on the APA, for just this reason. *See Dennis v. JPMorgan Chase & Co.*, 342 F.Supp.3d 404, 417 (S.D.N.Y. 2018).

Second, there *are* "indication[s] of bad faith or an effort to deceive or prejudice defendants" and the district court. *Cortlandt*, 790 F.3d at 422. Specifically, the decision to conceal FLH's role and sue in the name of dissolved entities in all three complaints filed in this case was self-evidently "deliberate or tactical." *Advanced Magnetics, Inc. v. Bayfront Partners*, 106 F.3d 11, 20 (2d Cir. 1997). Plaintiffs were surely aware *both* that an entity without legal existence lacks standing to sue *and* that any argument that the APA actually assigned FrontPoint's right to bring antitrust claims would be, at best, an uphill battle (*see* Point I.A *supra*). Knowing this, they tactically held back, moving for substitution only *after* Defendants confronted them—in October 2017, nearly two years after the original

complaint was filed and six years after FrontPoint was dissolved. JA268. Accordingly, under *Cortlandt*, Rule 17(a) substitution was inappropriate.

## II. THE DISTRICT COURT CORRECTLY DISMISSED ALL PLAINTIFFS' ANTITRUST CLAIMS.

"It is a well-established principle that, while the United States is authorized to sue anyone violating the federal antitrust laws, a private plaintiff must demonstrate 'standing.'" *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436 (2d Cir. 2005). The district court found that Sonterra and Dennis lacked antitrust standing because they were not "efficient enforcers" of the antitrust laws: their claims, based entirely on transactions with third parties in non-LIBOR linked instruments, were too remote and speculative. SA28-35. *Schwab II* confirms that the district court was correct.

The dismissal of all Plaintiffs' antitrust claims can also be affirmed on either of two alternative grounds: under *Harry* (overlooked by the district court), Plaintiffs' skeletal allegations of harm do not adequately allege antitrust injury; and Plaintiffs have not plausibly alleged an antitrust conspiracy.

### A. Plaintiffs Lack Antitrust Standing.

Congress never "intend[ed] the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 534 (1983) (quotation marks omitted). Instead, "a private plaintiff must

demonstrate standing" in order to state an antitrust claim, a requirement that helps ensure the plaintiff will be motivated to "vindicate the public interest in antitrust enforcement." *Daniel*, 428 F.3d at 443. Antitrust standing is a "threshold, pleading-stage inquiry," and where a complaint fails to establish standing, the court "must dismiss." *Gatt Comms., Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013) (cleaned up). To demonstrate antitrust standing, a plaintiff "must plausibly allege that (i) it suffered an antitrust injury and (ii) it is an acceptable plaintiff to pursue the alleged antitrust violations," *i.e.*, that it is "an 'efficient enforcer' of the antitrust laws." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157–58 (2d Cir. 2016). No Plaintiff has made that showing.[14]

## 1. *Schwab II* Confirms That Sonterra and Dennis Are Not Efficient Enforcers.

The efficient-enforcer analysis turns on the four *AGC* factors: (1) the "directness or indirectness of the asserted injury"; (2) the "existence of more direct victims of the alleged conspiracy"; (3) the extent to which plaintiffs' claim is "highly speculative"; and (4) the need to avoid "either the risk of duplicative recoveries on one hand, or the danger of complex apportionment of damages on the other." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 778 (2d Cir. 2016) ("*Gelboim*")

---

[14] Regardless, the Court need not consider whether FrontPoint lacks antitrust standing because, as shown in Point I, neither it nor FLH may assert antitrust claims. Plaintiffs' critique of Judge Broderick's FrontPoint analysis is therefore academic.

(quoting *AGC*, 459 U.S. at 540–45). The efficient-enforcer test is "an elaboration on the proximate cause requirement" of the Clayton Act. *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 134 (2d Cir. 2021) ("*Amex*").

**Directness**. "For the purposes of antitrust standing, proximate cause is determined according to the so-called 'first-step rule,'" under which only "injuries that happen at the first step following the harmful behavior are considered proximately caused by that behavior." *Schwab II*, 2021 WL 6143556, at *6 (quoting *Amex*, 19 F.4th at 140). Sonterra and Dennis did not deal directly with any Defendant or in LIBOR-based instruments; under *Schwab II*, they have failed to allege proximate cause.

1. *Schwab II* governs this case. There, the Court affirmed Judge Buchwald's decision in the U.S. Dollar LIBOR matter to "draw a line between plaintiffs who transacted directly with defendants and those who did not," such that "only those who transacted with the Banks suffered a direct antitrust injury." *Id.* at *6 (cleaned up) (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 7378980, at *16 (S.D.N.Y. Dec. 20, 2016) ("*LIBOR VI*")). Sonterra and Dennis concededly did not transact with any Defendant—only with third parties.[15] That

---

[15] As to Dennis, Plaintiffs' cited source (Br.23n.4) explains that "when a futures contract is bought or sold, the exchange becomes the buyer to every seller and the seller to every buyer." Plaintiffs' conjecture that Defendants "may well have been parties to CME contracts in which plaintiffs like Dennis transacted" (*id.*) is a *non sequitur*. The CME, not any other trader, is the futures trader's counterparty.

ends the inquiry, for "[t]he first-step rule and traditional proximate cause considerations require drawing a line between those whose injuries resulted from their direct transactions with the [b]anks and those whose injuries stemmed from their deals with third parties." *Schwab II*, 2021 WL 6143556, at *7. This holding, indistinguishable from the district court's, SA29, renders Plaintiffs' contrary views obsolete.

Several months ago, Plaintiffs posited (Br.26) that no court of appeals had *rejected* an umbrella claim like theirs. But more pertinently, this Court has since confirmed that it has "never *adopted*" a theory of umbrella standing—and explained why "umbrella standing [is] particularly inappropriate" in the benchmark context. *Schwab II*, 2021 WL 6143556, at *7 (emphasis added).

Benchmarks present a unique fact pattern from the antitrust standing perspective because they generate "a number that [is] available for unlimited third parties to reference and incorporate into their own products and transactions without any input from, or involvement by, the [b]anks." *Id.* In other words, "third parties *independently* decide[] to peg their [instruments'] terms to LIBOR." *Id.* (emphasis added). In that context, direct dealings between plaintiff and defendant are especially needed to create a sufficiently direct antitrust injury because any "decision of a third party to incorporate LIBOR as a term in a financial instrument could be made without any connection to the actions of the [defendants]," and "[s]uch

independent decisions snap the chain of causation linking [p]laintiffs' injury to the [b]anks' misconduct." *Id.*

*Schwab II* also noted that any other result "would yield liability that is far too sweeping and would, therefore, 'raise the very concern of damages disproportionate to wrongdoing' emphasized in cases that reject umbrella standing." 2021 WL 6143556, at *7 (quoting *Gelboim*, 823 F.3d at 779); *see also 7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, 771 F.App'x 498, 502 (2d Cir. 2019) ("*7W57*") (similar). And just as in *Schwab II*, Plaintiffs here have not alleged that Defendants dominated the relevant markets (in FX forwards or CME Sterling FX futures), such that they had any bearing on third parties' use of Sterling LIBOR. *Cf. Schwab II*, 2021 WL 6143556, at *7. Consequently, "[b]ecause the harm that befell [Sonterra and Dennis] is far removed from Defendants' conduct, it cannot be said that Defendants proximately caused the alleged antitrust injury." *Id.*

*Schwab II* also explained why Plaintiffs' extensive reliance (Br.20-32) on *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), is misplaced. *McCready* involved a "direct relationship between the pocket-book harm to the plaintiff and the market advantage gained by the defendants, which was the very goal of the conspiracy." *Schwab II*, 2021 WL 6143556, at *8. "Not so here. As noted above, Defendants derived no benefit from Plaintiffs' transactions with third parties. Those transactions, while arguably foreseeable to [Defendants], were entirely separate

from the purpose of the alleged conspiracy and took place merely because of LIBOR's unlimited public availability as a reference point for innumerable transactions." *Id.*[16]

2. The claims at issue here impermissibly extend far beyond the "first step" for an additional and independent reason: Sonterra and Dennis did not allege entering into any "LIBOR-denominated [transactions]." *Gelboim*, 823 F.3d at 779. Rather, they transacted only in Sterling FX forwards and CME Sterling FX futures, which are not indexed to LIBOR or any other interest rate. Under *Schwab II*, even if Sterling LIBOR "exerted a kind of gravitational force" to influence the value of those FX contracts, that would be "clearly insufficient" to allege antitrust standing. 2021 WL 6143556, at *8 n.6.

In *Schwab II*, Schwab alleged that LIBOR "was used indirectly in calculating rates for short-term, fixed-rate bonds, which do not reference LIBOR but are nevertheless assessed in terms of their spread relative to it," and claimed efficient-enforcer status. *Id.* at *2. This Court rejected Schwab's theory of antitrust standing as hopelessly remote. *Id.* at *8 n.6. That tracked the Court's prior treatment of similar allegations about LIBOR's supposed ancillary effects on non-LIBOR-based transactions: (1) a claim that "LIBOR affects the value" of financial instruments that

---

[16] The Court also distinguished, for similar reasons, *id.*, the Seventh Circuit cases on which Plaintiffs heavily rely (Br.26-29, 34).

were not "LIBOR denominated," which this Court found too indirect, *7W57*, 771 F.App'x at 502 (municipal bonds); and (2) a causal chain between alleged LIBOR manipulation and fixed-rate instruments that this Court deemed too "extended" to support fraud liability, *Schwab I*, 883 F.3d at 91.

Sonterra and Dennis are in the same boat. Unlike certain swaps or bonds for which LIBOR "[is] a component of price," *Gelboim*, 823 F.3d at 771, LIBOR is *not* incorporated into FX forwards or CME Sterling futures. Rather, as Plaintiffs unambiguously alleged, both types of FX contracts "*solely* involve[] the exchange of two different currencies on a specific future date at a fixed rate." JA87(CAC¶121(e)) (emphasis added); *see also* JA131-32(CAC¶212). Agreeing to swap two different currencies in the future at the then-operative exchange rate does not make Sterling LIBOR (or any other interest rate) a component of the instrument. Far from being "pegged to Sterling LIBOR" (Br.35), Sonterra's and Dennis's contracts were untethered to it.

It is remarkable how misleading Plaintiffs' brief and the Complaint's conclusory allegations—which are not entitled to be assumed true, *see Mandala v. NTT Data, Inc.*, 975 F.3d 202, 207 (2d Cir. 2020)—are on this point. For example, the CME's published Sterling FX futures contract specifications, incorporated by reference into the Complaint, identify the "Contract Unit" for Sterling FX futures as "62,500 British pounds" and the "Price Quotations" as "U.S. dollars and cents per

GBP increment." JA74(CAC¶98). Sterling LIBOR is wholly unmentioned, much less is there any LIBOR "peg" in Dennis' CME futures contracts. So too with Sonterra's FX forwards, alleged to be over-the-counter versions of futures. JA132(CAC¶212). Yet Plaintiffs repeatedly and inaccurately term these instruments "Sterling LIBOR-based derivatives," JA84(CAC¶121), JA128(CAC¶205) or the like, and misbrand them as "LIBOR-based." Br.14.[17]

The closest the Complaint comes to pleading an actual LIBOR connection are its vague assertions that some unidentified traders (but not Plaintiffs) might at times have chosen to incorporate Sterling LIBOR into some unidentified "cost of carry" formula they could use to determine whether to buy or sell FX forwards or futures. *See supra* at 9-10. But *Schwab I* rejected just such a boundless theory, precisely because it would allow plaintiffs to use their subjective valuations of non-LIBOR-linked products as a lever to create liability. 883 F.3d at 92 ("Schwab's arguments would seem to apply equally to a plaintiff suing under a theory that LIBOR suppression influenced a decision to purchase equity securities, thereby making Defendants potentially liable to anyone who purchased any security in the relevant time period.").

---

[17] To be sure, *other* futures contracts' specifications explicitly provide that the value of the contract *will* be determined based on Sterling LIBOR, albeit only at maturity. JA74(CAC¶98), JA88(CAC¶121(g)) (referring to LIFFE Three Month Futures). But no Plaintiff claims to have traded *those*, and they play no part in this case.

Even if Plaintiffs' fuzzy "formula" allegations were credited, they would at most show that if Sterling LIBOR ever enters the chain of causation, it does so several removes from the "first step." As Judge Broderick noted, Sonterra's FX forwards and Dennis's FX futures at most "incorporated LIBOR only implicitly through a complex formula involving numerous other causal factors," which were the "sort of 'vaguely defined links'" that are "too indirect to support the causation element." SA30 (quoting *AGC*, 459 U.S. at 540); *see also FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2017 WL 3600425, at *12 (S.D.N.Y. Aug. 17, 2017) (rejecting "conclusory statement" that "the price paid for a foreign exchange forward contract 'is calculated using a formula that incorporates both SGD SOR and USD SIBOR as components of price'").[18] The district court was thus right to conclude that any causal chain was far more extended for Sonterra and Dennis than for purchasers of actual LIBOR-based instruments like swaps—taking them impermissibly beyond the "first step."

**Other *AGC* factors.** As in *Schwab II*, "[w]hile the first factor alone furnishes ample justification for affirming the district court, the other *AGC* factors, on the

---

[18] As the district court noted, that such allegations might be sufficient for Article III purposes, *Sonterra Cap. Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 535 (2d Cir. 2020), does not mean they support antitrust standing. SA26 (quoting *Gelboim*, 823 F.3d at 770); *see Harry*, 889 F.3d at 112.

whole, likewise cut against a finding of antitrust standing." 2021 WL 6143556, at *9.

*First,* "the presence of plaintiffs who are better situated to vindicate the antitrust laws," although not dispositive, "is relevant to [the] second factor" (more direct victims). *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 66 (2d Cir. 2019). As in *IQ Dental* and *Schwab II*, more direct victims are easy to identify—those who, unlike Sonterra and Dennis, actually transacted in Sterling LIBOR-based instruments and did so directly with Defendants. *IQ Dental*, 924 F.3d at 65; *Schwab II*, 2021 WL 6143556, at *9.

*Second*, in evaluating whether damages are unduly speculative:

[C]onsiderations include (1) the extent to which the damages claim is conclusory in nature; (2) whether the injury is "so far down the chain of causation from defendants' actions that it would be impossible to untangle the impact of the fixed price from the impact of intervening market decisions," which relates to the causation factor; (3) whether external market factors affected the "relationship between the fixed price and the price that the plaintiffs ultimately paid;" and (4) whether "the non-fixed components of a transaction were heavily negotiated between the parties in relation to the fixed component."

SA32 (quoting *LIBOR VI*, 2016 WL 7378980, at *17–18).

As the district court correctly found, these considerations all cut against Sonterra and Dennis. The Complaint's damages claim—a bald assertion that "the amount of injury to Plaintiffs and Class . . . may be mathematically ascertained and computed" (JA81(CAC¶114))—was entirely conclusory. SA33. Dennis did not

even allege how trading prices of his futures contracts (which change moment to moment) related to movements in Sterling LIBOR (which change once per day). Small wonder, then, that the district court concluded "the allegations in the CAC are too vague to plausibly allege damages." SA34; *accord Schwab II*, 2021 WL 6143556, at *9 (deeming LIBOR plaintiffs' damages theory "highly speculative" because it "would require the court to speculate about how . . . third-party sellers would have factored a non-suppressed LIBOR into the transaction").

Plaintiffs' primary response is to deny that this Court can consider the absence of any cognizable damages theory, either because *Lexmark International, Inc v. Static Control Components, Inc.*, 572 U.S. 118 (2014), supposedly obviated this efficient-enforcer factor or because the question is reserved for the proof stage. Br.42-45. But this Court's post-*Lexmark* decisions have continued to apply the *AGC* factors, including the "speculative damages" inquiry. [19] And the Court has repeatedly reaffirmed *Gatt*'s holding that complaints failing to demonstrate antitrust standing "must [be] dismiss[ed] . . . as a matter of law." *Amex*, 19 F.4th at 138.

Plaintiffs' only gesture towards a damages theory is their contention that the Complaint "explains" how movements in LIBOR caused Sonterra and Dennis "to

---

[19] *See, e.g.*, *Schwab II*, 2021 WL 6143556, at *9 (considering this factor, although according it "limited weight"); *IQ Dental*, 924 F.3d at 66-67.

pay more or receive less than they would have." Br.45. But that hazy, alternative formulation overpromises; the cited paragraphs explain no such thing.

Take Dennis's sole specific claim: he bought CME Sterling FX futures on May 11, 2010, and sold them two days later, supposedly losing roughly $38,000. JA133-34(CAC¶214). Entirely unstated is how Sterling LIBOR movements caused Dennis to "pay more or receive less." Dennis makes no allegation as to what Sterling LIBOR was over that 48-to-72 hour period, how it changed during that time, or even that (or how) it was manipulated at (or even around) that time. There are no allegations as to how Sterling LIBOR factored into the prices Dennis paid or received for his futures, or how the "cost of carry" would have any effect on a position held over only two days. Dennis offers only the conclusory assertion that his "loss was directly and proximately caused by Defendants' manipulative conduct." JA133-34(CAC¶214). That "formulaic recitation . . . will not do." *Twombly*, 550 U.S. at 555.

Sonterra's damages theory is even more threadbare. As noted above, Sonterra provided no details about its supposed FX forwards transactions: no dates, prices paid or received, description of Sterling LIBOR movements, or quantum of harm. A plaintiff's inability or unwillingness to provide a more concrete damages theory "suggests that a given plaintiff is an inefficient engine of enforcement." *IQ Dental*, 924 F.3d at 66–67 (cleaned up).

38

In sum, just as Plaintiffs predicted, *Schwab II* has "resolve[d]" their efficient enforcer arguments, Br.17—decisively against them.

## 2. No Plaintiff Has Adequately Alleged Antitrust Injury.

The judgment can also be affirmed on the alternative basis that no Plaintiff has plausibly alleged any antitrust injury. The district court thought otherwise after *Gelboim* (SA27-28), but failed to reckon with *Harry*, which established that to plausibly allege antitrust injury, private antitrust plaintiffs must plead "some reason to believe that any damage has occurred at all." 889 F.3d at 115.

*Harry* teaches that a complaint fails to adequately allege antitrust injury when it provides "just as much support" for the proposition that the plaintiff "*benefited*" from, rather than being "*harmed*" by, alleged manipulation. *Id.* at 115. The *Harry* plaintiffs failed to explain why supposedly wrongful price movements in a separate but allegedly adjacent market affected their derivatives, and, if so, why the movement was adverse to their position. They offered the conclusory assertion that they transacted at "artificial prices," but this Court saw no "evidence" in the complaint to support that claim, *id.* at 116, particularly because "unlike in the case of privity," market shifts exogenous to a derivative's specific underlying terms "will not inherently be to a plaintiff's detriment," and she "will have to plead additional facts to make it plausible that the impact on her was harmful rather than neutral or beneficial." *Id.* at 112-13.

That is precisely what Plaintiffs here failed to do. They alleged that Sterling LIBOR was manipulated in day-to-day, episodic fashion, both upward and downward—but failed to explain how *they* suffered a loss, from a transaction on the "losing" side of a manipulated Sterling LIBOR, on even a single date. Without such allegations, injuries cannot be distinguished from windfalls. *See In re SSA Bonds Antitrust Litig.*, 2020 WL 1445783, at *4 (S.D.N.Y. Mar. 25, 2020) ("*SSA I*"), *aff'd sub nom. Alaska Dep't of Revenue, Treasury Div. v. Manku*, 2021 WL 3027170 (2d Cir. July 21, 2021) ("*SSA II*").

*Gelboim* was different. The defendants there allegedly "depress[ed]" a single benchmark *persistently*, a unidirectional scheme that, in the Court's view, was sufficiently predictable to support a plausible inference of injury. 823 F.3d at 774-76. That is not Plaintiffs' theory here. Instead, they posit *ad hoc*, sporadic, and fluctuating up-and-down LIBOR manipulation—the very scenario in which adversity cannot simply be assumed. *Harry*, 889 F.3d at 112-13.

### B. Plaintiffs Have Not Alleged Any Plausible Conspiracy.

The district court's decision can be affirmed on yet another basis: Plaintiffs' failure to allege a plausible antitrust conspiracy. While Plaintiffs breezily assert otherwise (Br.11), the district court did not analyze that issue as to any bank other

than UBS. *Supra* at 14. And for those Defendants, the CAC falls far short of the mark.[20]

Plaintiffs alleging an antitrust conspiracy must plead facts supplying either direct evidence of a conspiracy or circumstantial evidence in the form of parallel conduct coupled with "plus factors" that, taken together, give rise to a plausible inference of conspiracy. *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 137-38 (2d Cir. 2013). Where an antitrust complaint names multiple defendants, "plaintiffs must make allegations that plausibly suggest that each defendant participated in the alleged conspiracy." *SSA I*, 2020 WL 1445783, at *5 (cleaned up).

Plaintiffs plead no direct, or even indirect, evidence of any Sterling LIBOR conspiracy. They allege no direct communications between Defendants, or any statistical or other evidence probative of a supposed six-year interbank conspiracy to manipulate Sterling LIBOR. Other than as to RBS, about which they allege nothing at all, Plaintiffs' conspiracy allegations are premised solely on Defendants' supposed admissions in government settlements. JA38(CAC¶5). But those settlements, incorporated by reference into the Complaint, contain no allegations relating to interbank collusion to manipulate Sterling LIBOR.

---

[20] Plaintiffs have not appealed BCI's dismissal. SA54-55.

Plaintiffs thus resort to sleight-of-hand, which takes several forms. They cite regulatory findings relating to LIBORs in *other* currencies as though they concerned Sterling LIBOR. *Compare* JA42-43(CAC¶16) (generalized allegation about Deutsche Bank/LIBOR) *with* cited consent order (containing no Sterling LIBOR allegations).[21] But these misleading allegations amount to assertions that "if it happened there, it could have happened here," which fail to state a claim. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *45 (S.D.N.Y. Oct. 20, 2015) (rejecting "impermissible inference" that admission concerning one LIBOR currency "suffices to overcome deficiencies in the pleading of actionable bad behavior in" another).

Plaintiffs also seek to recast alleged unilateral, *intra*-bank manipulation as if it were inter-bank collusion. *Compare* JA97-98(CAC¶¶141-42) (alleging that Rabobank engaged in *interbank* Sterling LIBOR conduct) *with* cited consent order (containing only allegations regarding *internal* Sterling LIBOR communications).[22] The distinction that Plaintiffs seek to blur is critical: such internal requests are not actionable under the antitrust laws. *See Copperweld Corp. v. Indep. Tube Corp.*,

---

[21] https://www.dfs.ny.gov/system/files/documents/
2020/04/ea150423_deutsche_bank.pdf

[22] *See* https://www.justice.gov/sites/default/files/opa/press-
releases/attachments/2014/11/06/statement_of_facts.pdf

467 U.S. 752, 771 (1984). Plaintiffs fail to allege that multiple banks' independent internal requests for higher or lower LIBOR submissions even occurred at the same time or in the same direction. The regulatory settlements do not support parallel conduct, far less a conspiracy.

Plaintiffs' attempts to "spin" the settlements fail, because it is the settlement documents, incorporated by reference, that control—not Plaintiffs' mischaracterizations. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011). And the settlements do not furnish any support for Plaintiffs' antitrust conspiracy theory. *See SSA II*, 2021 WL 3027170, at *4 (affirming dismissal of antitrust claim even with evidence of anticompetitive acts by individual traders, because "the broad conspiracy alleged by plaintiffs is simply not plausible").

*          *          *

Finally, the CAC also fails as against LBG for an additional reason: as the district court noted, LBG is a "holding company" that was never a member of the Sterling LIBOR panel. SA7. As parent company of banks that served on various LIBOR panels, LBG was a party to two of the three settlements on which Plaintiffs premise their case. Those settlement documents, however, make clear that employees of the subsidiaries, rather than LBG, carried out any relevant Sterling LIBOR-related conduct. JA46-47(CAC¶¶22-23&nn.20-22). Indeed, the UK's FCA

43

took no action against LBG at all.[23]  Other than via conclusions and labels, *LBG* is not alleged to have done anything relevant.  That is plainly inadequate.  *See, e.g.*, *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F.Supp.3d 380, 388 (S.D.N.Y. 2019) ("Post-*Twombly* authorities overwhelmingly hold that a complaint that provides no basis to infer the culpability of the *specific* defendants named in the complaint fails").

## III.  THE DISTRICT COURT CORRECTLY DISMISSED DENNIS'S CEA CLAIMS.

This Court should affirm the district court's dismissal of Dennis's CEA claim for failure to adequately allege specific intent.  Alternatively, affirmance is warranted for failure to plead "actual damages," because Dennis's claim is impermissibly extraterritorial, and because it is time-barred.

### A. The District Court Correctly Held that Dennis Failed to Adequately Allege Specific Intent.

The district court properly held that Plaintiffs failed to allege facts sufficient to raise a plausible inference that Defendants specifically intended to cause artificial prices in CME Sterling FX futures, SA44-45—the only financial instruments that Dennis allegedly traded.  JA133(CAC¶214).

A plaintiff asserting a CEA price manipulation claim must allege facts plausibly showing that "Defendants specifically intended to cause the artificial price."

---

[23] *See* https://www.fca.org.uk/publication/final-notices/lloyds-bank-of-scotland.pdf.

*In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (cleaned up). Because Dennis's manipulation claim is based on alleged false reporting of LIBOR rates, it sounds in fraud and Rule 9(b) applies.[24] Dennis was, therefore, required to allege facts sufficient to "give rise to a strong inference" of fraudulent intent, *i.e.*, one that is "at least as compelling as any opposing inference one could draw from the facts alleged." *In re Amaranth Nat. Gas Commodities Litig.*, 587 F.Supp.2d 513, 529, 536 (S.D.N.Y. 2008) (citation omitted). Where, as here, a CEA claim is premised on transactions in a futures contract, the specific intent to manipulate must be directed at either "the price of such contract or the price of the commodity underlying such contract." 7 U.S.C. § 25(a)(1)(D);[25] *accord Amaranth*, 730 F.3d at 183.

On appeal, Dennis contends that he has adequately alleged that Defendants intended to manipulate: (i) "the prices of Sterling FX Futures, among other Sterling LIBOR-based financial instruments" (Br.55), (ii) Sterling LIBOR (a benchmark

---

[24] This Court has not yet decided the issue, *In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, 560 F.App'x 84, 86 (2d Cir. 2014) ("*Silver Futures*"), but Dennis's CEA claim would fail even under the ordinary pleading requirements of Rule 8(a).

[25] Because Dennis allegedly transacted in Sterling FX futures in May 2010—*i.e.*, prior to enactment of the Dodd-Frank Act, which became effective July 16, 2011, *see* 7 U.S.C. § 1a note—the pre-Dodd-Frank CEA governs. *See Amaranth*, 730 F.3d at 173 n.1.

index) (Br.56-58), and (iii) the price of Sterling (the currency) (Br. 58-59).  Each argument fails.

## 1.  Dennis Failed to Allege that Defendants Specifically Intended to Manipulate the Price of Sterling FX Futures.

Dennis did not come close to alleging facts sufficient to raise a plausible (let alone a strong) inference that Defendants acted "with the purpose or conscious object of causing or affecting a price or price trend in" CME Sterling FX futures.  *Silver Futures*, 560 F.App'x at 87.  The Complaint contains *no* facts suggesting that Defendants directed any of their alleged misconduct at the prices of Sterling FX futures.  SA44-45.  Dennis speculated that Defendants' futures transactions might have motivated their alleged conduct (Br.55 (citing JA74(CAC¶98))), but it is well settled that the mere allegation that a defendant had a position in the market is insufficient to support an inference of specific intent.  *Silver Futures*, 560 F.App'x at 86 (rejecting as insufficient allegation that defendant had a "large short position in silver futures [that] incentivized [it] to depress prices") (citing *Amaranth*, 730 F.3d at 184); SA44.

Nor do the regulatory settlements suggest that any Defendant intended to cause artificial prices in Sterling FX futures.  No government agency alleged or even suggested that the misconduct it identified was directed at or extended to *Sterling FX futures* (or to foreign exchange futures in any currency).  SA45.

46

Dennis cannot satisfy his burden by arguing that Defendants intended to cause artificial prices in "*other* Sterling LIBOR-based financial instruments" (Br.54-55) (emphasis added), such as "over-the-counter instruments" and a range of "exchange-traded futures and options." JA84(CAC¶121)). Dennis was required to allege facts suggesting specific intent to cause artificial prices in the *particular futures contracts* on which *his* claim is premised—CME Sterling FX futures—or their underlying commodity. *See* 7 U.S.C. § 25(a)(1)(D); *Amaranth*, 730 F.3d at 183. And even if Dennis had adequately pleaded intent to manipulate "Sterling LIBOR-based" exchange-traded futures generally, Dennis did not plausibly allege that his FX futures contracts were "LIBOR-based"; the Complaint and CME contract specifications make plain that they were not. *Supra* at 10.

## 2. Dennis Failed to Allege Specific Intent to Manipulate the Commodity Underlying Sterling FX Futures.

Dennis also failed to plausibly allege that Defendants acted "with the purpose or conscious object of causing or affecting a price or price trend in" the "commodity underlying" Sterling FX futures. *Silver Futures*, 560 F.App'x at 87. Dennis claims that he has adequately alleged: (1) specific intent to manipulate Sterling LIBOR (the benchmark), purportedly a "commodity" under the CEA; and (2) intent to manipulate the price of Sterling (the currency). Both arguments are meritless.

### a. Sterling—Not Sterling LIBOR—Is the Commodity Underlying Sterling FX Futures.

The "commodity underlying" a futures contract is "the commodity specified within the particular futures contract." *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F.Supp. 1033, 1043 (S.D.N.Y. 1993). Thus, the Court "must look to the futures contract at issue to determine its underlying commodity." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 764 (7th Cir. 2015); *see also Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 247 (5th Cir. 2010) ("By definition, the underlying [commodity] of a futures contract depends on the *contract* itself.") (emphasis in original); *Leist v. Simplot*, 638 F.2d 283, 286 (2d Cir. 1980); *LIBOR I*, 935 F.Supp.2d at 682-83.

Dennis's allegations and the relevant CME contract specifications unambiguously establish that the "commodity underlying" Sterling FX Futures is Sterling (priced in terms of U.S. dollars). The Complaint could not be clearer: "[e]ach [Sterling FX Futures] contract is *an agreement to buy or sell £62,500*, in terms of U.S. Dollars, on some future date." JA131(CAC¶212) (emphasis added); *supra* at 8. Indeed, CME Sterling FX Futures contracts are settled through actual delivery of Sterling (in exchange for U.S. dollars) via a clearing system for

international foreign currency exchange.[26]  They are essentially bets on future foreign currency exchange rates (Sterling/USD), not on future Sterling LIBOR or any other interest rate.

### b. Plaintiffs' Allegations Regarding Intent to Manipulate Sterling LIBOR Are Unavailing.

Because Sterling LIBOR isn't the "commodity underlying" CME Sterling FX Futures, Dennis's assertions about Defendants' intent to manipulate Sterling LIBOR miss the mark.  That is: even if Plaintiffs had adequately alleged that Defendants intended to manipulate Sterling LIBOR, that Sterling LIBOR was itself a commodity,[27] and that it impacted Sterling FX futures price, such allegations would still not show any intent to manipulate the price of the "commodity *underlying*" CME Sterling FX Futures—*i.e*., Sterling (the currency) in Dollar terms.  *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 764-65 (7th Cir. 2015) (where "the commodity specified in the Class III milk futures contract [was]

---

[26]GBP/*USD Futures Settlement Procedures*, CME Group, https://www.cmegroup.com/confluence/display/EPICSANDBOX/British+Pound; *see also* CME, *CME Rulebook*, §§ 25100-02, https://www.cmegroup.com/content/dam/cmegroup/rulebook/CME/III/250/251/251.pdf.

[27] The notion that Sterling LIBOR itself is a "commodity" under the CEA is "simply implausible."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F.Supp.2d 606, 612-14 (S.D.N.Y. 2013) ("*LIBOR II*").  But even if it was a commodity "in some freestanding sense," the "relevant question is . . . whether LIBOR is *the commodity underlying* [Sterling FX Futures]."  *LIBOR I*, 935 F.Supp.2d at 720 (emphasis added).  It is not.  *See also Hershey*, 610 F.3d at 241 ("The modifier 'underlying' has an important effect on 'commodity.'").

milk, not cheese," intent to manipulate the price of cheese was insufficient, even if manipulation of cheese prices "necessarily resulted in higher . . . milk future prices"); *Hershey*, 610 F.3d at 247 (rejecting allegations of intent to manipulate gas prices other than those at the Henry Hub as insufficient, even if those other prices directly affected the price of gas at the Henry Hub); *Three Crown*, 817 F.Supp. at 1043 (noting that "while defendants' alleged manipulation of [secondary] Markets in Treasury notes may have adversely impacted positions plaintiffs took in the Treasury bill and Eurodollar futures markets," Treasury notes were "not the commodity 'underlying'" those futures).

### c. Dennis Fails to Plead Specific Intent to Manipulate Sterling.

Dennis argues, for the first time on appeal, that the Complaint adequately alleged Defendants' intent to manipulate the price of Sterling (the currency). Dennis "waived this argument by failing to present it to the district court." *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 130 (2d Cir. 2008). And waiver aside, the CAC contains *no* allegations, let alone any plausible ones, suggesting that Defendants' conduct was directed at manipulating the price of Sterling (or, more specifically, the USD/Sterling exchange rate).

Plaintiffs' contention that Sterling LIBOR "moves the price of pound sterling over time, thus changing the price of Dennis's futures contracts" (Br.58) is both unpleaded and implausible. Plaintiffs' brief cites nothing other than the Complaint's

vague and conclusory assertions about a purported "formula that incorporates Sterling LIBOR." JA132(CAC¶212). The Complaint says *nothing* about the impact, if any, of Sterling LIBOR on the USD value of Sterling. Nor does the Complaint explain how or why artificiality in Sterling LIBOR (a benchmark interest-rate index) could affect the USD/Sterling foreign exchange rate (one of the most heavily traded currency pairs in the world, with much of the trading driven by real-world economic activity and commerce). And even if the Complaint *had* alleged that Sterling LIBOR affects Sterling currency prices, that still would not suffice to show that Defendants *specifically intended* to manipulate the price of Sterling. *Compare supra* at 6.

It is no answer to point to the CFTC's generalized allegations that Defendants' traders sought to manipulate Sterling LIBOR to benefit their "cash and derivatives *trading positions*." Br.58 (emphasis added) (citing, *inter alia*, JA83-84(CAC¶¶120(b),(f),(g)). Even a cursory review of the CFTC orders makes clear that they refer to "interbank cash deposits" and "loans" *that were indexed to* LIBOR. *See, e.g.*, *Rabobank*, 2013 WL 5872872, at \*1-2, \*4; *see also In re Deutsche Bank AG*, CFTC No. 15-20, 2015 WL 1874880, at \*1, \*6 (Apr. 23, 2015); *In re Lloyds Banking Grp. plc and Lloyds Bank plc*, CFTC No. 14-18, 2014 WL 3783951, at \*4 (July 28, 2014). Plaintiffs do not (and cannot) allege that the CFTC orders even once suggested that the conduct extended to manipulation of exchange rates generally or the Sterling/USD rate specifically.

**B. Plaintiffs Also Failed to Allege That Dennis Suffered Actual Damages.**

Affirmance is also warranted on the alternative ground that Plaintiffs failed to allege another essential CEA element: actual damages. The district court credited Plaintiffs' conclusory allegations and deemed Dennis's bald assertion that he "transacted 'at artificial prices'" sufficient to allow injury to "be presumed." SA42-43 (internal citation omitted). *Harry* demonstrates the error in that analysis.

Section 22 of the CEA grants a private cause of action only to those suffering "actual damages ... caused by [the alleged] violation." 7 U.S.C. §25(a)(1). That requires more than Article III injury-in-fact. *Harry*, 889 F.3d at 110. A plaintiff "must show that the CEA violation *proximately caused* the damages" for which relief is sought. *S&A Farms, Inc. v. Farms.com, Inc.*, 678 F.3d 949, 953 (8th Cir. 2012). Specifically, a plaintiff claiming market manipulation must "plausibly allege" sufficient detail to show "(1) that she transacted in at least one commodity contract at a price that was lower or higher than it otherwise would have been absent the defendant's manipulations, and (2) that the manipulated prices were to the plaintiff's detriment." *Harry*, 889 F.3d at 112 (citing 7 U.S.C. § 25(a)(1)(D)).

As noted (*supra* at 10, 33-35, 38), Dennis has not alleged any plausible link between Sterling LIBOR and the prices at which he transacted, as *Harry* requires— no privity, no "formal rule-based price linkage," no "readily discernible" and "tangible mechanism" by which Defendants' actions would harm him. 889 F.3d at

113, 115-16.  Far from pleading the "greater detail" *Harry* mandates, Dennis did not begin to allege how Sterling LIBOR supposedly affected the trading prices of his FX futures.

Even if Dennis's causal theory were credited in the abstract, he still failed to plead any facts plausibly suggesting that *he* was materially affected at all by Defendants' conduct, let alone negatively.  The Complaint contains no plausible allegations that Defendants engaged in any conduct that rendered Sterling FX futures prices artificial on the two days in May 2010 when Dennis transacted.  *See Amaranth*, 730 F.3d at 173 (a plaintiff asserting a CEA manipulation claim must allege facts plausibly showing that, *inter alia*, "an artificial price existed") (quoting *Hershey*, 610 F.3d at 247).  The CAC says nothing at all about Sterling LIBOR manipulation in May 2010, or indeed in *any* of the 10 months preceding Dennis's transactions, dating back to July 2009.  Nor do Plaintiffs allege any other mechanism by which Defendants' alleged episodic manipulation of Sterling LIBOR—a benchmark that was set anew daily—could cause persistent artificiality.  *See LIBOR II*, 962 F.Supp.2d at 622 (trader-based claims of episodic manipulation "entail only that LIBOR was artificial for certain discrete days during the class period, and thus the allegation that plaintiffs traded during the class period is insufficient to show that plaintiffs suffered actual damages.").

In finding otherwise, the district court misunderstood the Complaint to advance a "persistent suppression" theory of manipulation. SA43-44. But that was not Plaintiffs' theory; they instead pled only episodic, bidirectional LIBOR movement. *Supra* at 6. Unlike persistent manipulation, "episodic manipulation does not warp market forces continuously throughout the class period." *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F.Supp.3d 885, 922 (S.D.N.Y. 2018) ("*London Silver*"). Rather, the "'day-to-day' and 'episodic'" nature of the alleged manipulation means that "[p]roof that a bank caused an artificial price one day will not determine whether it did so on another day." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 1558504, at *9 (S.D.N.Y. Apr. 15, 2016).

For this reason, "[a]lleging actual damages in an 'episodic manipulation' case is more difficult." *London Silver*, 332 F.Supp.3d at 923. Plaintiffs pursuing such a theory are required to plausibly allege, among other things, "that they engaged in a transaction at a time during which prices were artificial as a result of defendants' alleged trader-based manipulative conduct." *LIBOR II*, 962 F.Supp.2d at 622. Or, in other words, "that [they] transacted . . . at a price that was lower or higher than it otherwise would have been." *Harry*, 889 F.3d at 112. Dennis alleged nothing like that.

Even more, Dennis has not shown that any purported "impact" on his trading position was "negative," as opposed to "neutral or beneficial." *Harry*, 889 F.3d at

112-13. "Futures trading is a zero-sum game" where "[e]very contract has a long and a short" and "every gain can be matched with a corresponding loss." *Leist*, 638 F.2d at 286-87. While courts have found that a plaintiff who plausibly alleges persistent *uni*directional manipulation may adequately allege actual injury by pleading that she took an adverse position in the market during the alleged period of sustained unidirectional manipulation,[28] that theory has no application in a *bi*directional manipulation scenario. Unlike persistent *uni*directional manipulation, the bidirectional manipulation at issue here "does not warp market forces . . . in a predictable manner." *London Silver*, 332 F.Supp.3d at 922. Rather, "because the manipulation was allegedly varying in direction, there may be some days when plaintiffs were actually helped, rather than harmed, by the alleged artificiality, depending on their position in the market." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F.Supp.3d 447, 461 (S.D.N.Y. 2014). "Because episodic manipulation—unlike persistent suppression—may move the market in either direction . . . more detailed allegations are required." *London Silver*, 332 F.Supp.3d at 923; *LIBOR II*, 962 F.Supp.2d at 622 (plaintiff must allege facts showing that "the artificiality was adverse to [her] position").

---

[28] *See, e.g.*, *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *29 (S.D.N.Y. Mar. 28, 2017).

Dennis offered no such allegations—no indication of whether higher or lower Sterling LIBOR would have helped or harmed his position, via the "cost of carry" or otherwise.[29]  In other words, "[t]he lack of directionality is fatal to the complaint." *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 435 F.Supp.3d 845, 869 (N.D. Ill. 2020); *see also id.* at 870 ("Without alleging directionality (or some degree of price inflation or suppression), plaintiffs may not have suffered any net loss.").  In these circumstances, "[o]nly speculation" could support the conclusion that Dennis was harmed by any alleged Sterling LIBOR manipulation.  *Harry*, 889 F.3d at 115.

### C. Dennis's CEA Claim Is Impermissibly Extraterritorial.

Alternatively, this Court can affirm the dismissal of Dennis's CEA claim because it is "impermissibly extraterritorial" under the intervening authority of *Prime*.

The CEA's private right of action does not apply extraterritorially.  *Prime*, 937 F.3d at 102-04.  To state a claim, a plaintiff "must allege not only a domestic transaction, but also domestic—not extraterritorial—*conduct* by Defendants that is violative of" the CEA.  *Id.* at 105.  This rule "carrie[s] over" from the securities-

---

[29] Dennis does not even allege whether the prices of Sterling FX Futures are negatively or positively correlated with Sterling LIBOR (*i.e.*, whether a higher Sterling LIBOR results in higher or lower Sterling FX Futures prices).

fraud context, *id.*, where a domestic transaction is "necessary" but "not alone sufficient" to state a claim. *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 215 (2d Cir. 2014).

*Prime* affirmed dismissal of a CEA claim based on allegations strikingly similar to those here. In *Prime*, the plaintiffs claimed that defendants manipulated the North Sea oil market, intending to manipulate benchmark prices published by a London agency, which in turn allegedly impacted the prices of futures contracts that the parties traded on domestic and foreign exchanges. *Prime*, 937 F.3d at 98-100. This Court affirmed dismissal of plaintiffs' claim as impermissibly extraterritorial, explaining that the allegation relied on an "attenuated 'ripple effects' theory," whereby the "alleged manipulative . . . activity" affected prices for a "foreign commodity," which "affected a foreign benchmark," which was "disseminated by a foreign price-reporting agency," which "was then allegedly used (in part) to price futures contracts traded on exchanges around the world." *Id.* at 106-07. "Nearly every link in Plaintiffs' chain of wrongdoing [wa]s entirely foreign." *Id.*

The same analysis applies here. Plaintiffs' allegation is that foreign institutions made artificial submissions for Sterling LIBOR—an interest-rate benchmark for borrowing British currency in the London interbank market—to the BBA, a U.K. trade association. JA81-83(CAC¶¶115-116, 118, 120). As in *Prime*,

Plaintiffs rely on an "attenuated 'ripple effects' theory" involving a "winding chain of foreign, intervening events," in particular, that alleged manipulation of a foreign benchmark was "allegedly used (in part) to price futures contracts." 937 F.3d at 100, 106-08. Indeed, here, Plaintiffs' theory is even more attenuated than the theory rejected in *Prime* because the futures contract at issue does not settle to the allegedly manipulated benchmark—not even in part, as in *Prime*.[30]

Moreover, even setting aside the many twists in Plaintiffs' winding causal chain, extraterritoriality ultimately turns on the "foreignness of the facts constituting the defendant's alleged violation." *Parkcentral*, 763 F.3d at 215. And, here, the conduct was predominantly, if not entirely, foreign, for the same reasons that the district court rejected Plaintiffs' RICO claims as insufficiently domestic below: because "the scheme was principally foreign in nature and only incidentally touched the United States." SA50. Plaintiffs have not appealed that ruling, perhaps because it is plainly borne out by the Complaint, which does not plausibly allege that *any* manipulative conduct relating to Sterling LIBOR occurred in the United States.[31]

---

[30] At least one district court has correctly applied *Prime* to dismiss as impermissibly extraterritorial similar CEA claims based on alleged interest rate benchmark manipulation. *See Laydon v. Mizuho Bank, Ltd.*, 2020 WL 5077186, at *2 (S.D.N.Y. Aug. 27, 2020). That decision is on appeal. *See* No. 20-3626.

[31] Plaintiffs' only response is to blatantly misread the settlement documents. For example, Plaintiffs allege that a senior manager in UBS's Connecticut headquarters directed UBS' LIBOR submitters to manipulate LIBOR submissions "across all currencies, including Sterling LIBOR." JA69(CAC¶85). But the page of the CFTC

In any event, "the presumption against extraterritoriality would be a 'craven watchdog indeed' if it 'retreated to its kennel whenever *some* domestic activity is involved.'" *Prime*, 937 F.3d at 102 (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 266 (2010)). This Court has repeatedly held in the securities context that *predominantly* foreign alleged conduct is simply not sufficiently domestic, even where some alleged misrepresentations were "directed into the United States" through "telephone calls or on visits to the United States" or were "made to investment managers in New York." *Parkcentral*, 763 F.3d at 207-08, 215-16; *see also Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 167-68 (2d Cir. 2021) (applying *Parkcentral* to conclude that an Exchange Act claim involving a private agreement between two foreign entities was impermissibly extraterritorial, notwithstanding allegations that a foreign defendant made a misstatement from New York and had its principal place of business and officers/directors in New York). The alleged connections between Dennis's claim and the United States are even more isolated and tenuous, and do not support a domestic application of the CEA.

---

order Plaintiffs cited for this allegation does not mention Sterling LIBOR at all. *See* UBS CFTC Order at 48 (December 19, 2012), https://www.cftc.gov/sites/default/files/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfubsorder121912.pdf (referencing a request to adjust U.S. Dollar submissions). Similarly, Plaintiffs allege that a former Rabobank employee based in New York, "made multiple requests for false LIBOR submissions" (JA97(CAC¶140)), but do not allege that he made any *Sterling* LIBOR requests.

### D. Dennis's CEA Claims Are Time-Barred.

Alternatively, Dennis's CEA claim is untimely.  A CEA claim "shall be brought not later than two years after the date the cause of action arises."  7 U.S.C. § 25(c). The at-issue conduct here allegedly occurred between January 1, 2005, and December 31, 2010.  SA19.  Dennis did not trade after May 13, 2010 (JA133(CAC¶214)), yet only filed his complaint on January 21, 2016 (SA19). Indeed, he conceded below his CEA claim was untimely as to Barclays, UBS, and RBS, because those banks publicly announced LIBOR-related settlements with regulators no later than February 6, 2013—more than two years before he filed suit.

The district court, however, found that the fraudulent concealment doctrine tolled the limitations period as to Rabobank and LBG, which did not publicly announce their own settlements until October 29, 2013 and July 28, 2014, respectively.  The district court concluded that a public statement by the BBA in 2008 "that their Sterling LIBOR quotes were accurate" amounted to fraudulent concealment of the alleged CEA violations, tolling the statute of limitations as to each Defendant until that *specific* Defendant publicly announced LIBOR-related settlements.  SA25.  To be clear, the Complaint does *not* allege that Rabobank or LBG made any false statement in 2008, only that all Defendants are responsible for the BBA's statement "because the BBA was Defendants' trade organization." JA139-40(CAC¶230).

In all events, this Court's recent decisions confirm that the district court was wrong to consider the limitations period tolled on a per-Defendant basis. Rather, tolling for fraudulent concealment ends once a plaintiff is either actually aware of the nature of his claim or constructively aware because of publicly available disclosures. *See Zirvi v. Flatley*, 838 F.App'x 582, 586 (2d Cir. 2020) (holding that public proceedings involving "substantially the same claims, and several of the same parties, as here" were sufficient to put plaintiffs "on inquiry, if not actual notice"). After the decision below, this Court clarified that whether a plaintiff is on "notice" is *not* a defendant-specific question. "The relevant inquiry [] is not whether [plaintiff] had discovered the identity of the defendants or whether she had discovered the manipulation scheme she alleges in her complaint. Rather, the question is when [plaintiff] discovered her CEA injury." *Levy v. BASF Metals Ltd*., 917 F.3d 106, 108 (2d Cir. 2019).

*Levy*'s thrust is that a CEA plaintiff is on sufficient "notice" of the nature of her claim (terminating any applicable tolling period) even if she lacks specific information regarding each potential defendant. That point has particular force here, because Plaintiff is relying entirely on the BBA's 2008 statement, which was vitiated at the latest after Barclays, UBS, and RBS publicly announced regulatory settlements in 2012-13. Dennis has conceded that he was aware of his CEA injury in 2012-13 as to Barclays, UBS, and RBS pursuant to their public settlements; *Levy*

confirms that discovery was enough to end fraudulent concealment as to *all* Defendants.  That renders Dennis's CEA claims untimely in full.

*          *          *

The CEA claim against Rabobank is also untimely for the additional reason that Dennis did not file his complaint until January 21, 2016, more than two years after Rabobank announced its settlement in October 2013.  SA19.  Thus, even if defendant-specific notice was required, it was provided in Rabobank's case.

Because Dennis fails to state a primary CEA claim, his secondary CEA claims for principal-agent liability and aiding and abetting necessarily fail.  *See Amaranth*, 730 F.3d at 183.

## CONCLUSION

For the foregoing reasons, the judgment should be affirmed.

Respectfully submitted,

/s/ Jeffrey T. Scott
_____

Jeffrey T. Scott
Matthew J. Porpora
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
scottj@sullcrom.com
porporam@sullcrom.com

*Counsel for Defendants-Appellees
Barclays Bank PLC and Barclays
Capital Inc.*

/s/ Marc J. Gottridge
_____

Marc J. Gottridge
Lisa J. Fried
HERBERT SMITH FREEHILLS
NEW YORK LLP
450 Lexington Avenue
New York, NY 10017
Telephone (917) 542-7600
marc.gottridge@hsf.com
lisa.fried@hsf.com

Benjamin A. Fleming
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3000
benjamin.fleming@hoganlovells.com

*Counsel for Defendant-Appellee
Lloyds Banking Group plc*

/s/ Eric J. Stock
Mark A. Kirsch
Eric J. Stock
Jefferson E. Bell
GIBSON, DUNN & CRUTCHER
LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

*Counsel for Defendant-Appellee-Cross-Appellant UBS AG*

/s/ David S. Lesser
David S. Lesser
Laura Harris
KING & SPALDING LLP
1185 Avenue of the Americas
34th Floor
New York, NY 10036
Telephone: (212) 556-2100
dlesser@kslaw.com
lharris@kslaw.com

G. Patrick Montgomery
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
2nd Floor
Washington, D.C. 20006
Telephone: (202) 737-0500
pmontgomery@kslaw.com

*Counsel for Defendant-Appellee The Royal Bank of Scotland plc (n/k/a NatWest Markets plc)*

/s/ David R. Gelfand
David R. Gelfand
Tawfiq S. Rangwala
MILBANK LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
dgelfand@milbank.com
trangwala@milbank.com

Mark D. Villaverde
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Tel: (424) 386-4000
Fax: (213) 892-4743
mvillaverde@milbank.com

*Counsel for Defendant-Appellee Coöperatieve Rabobank U.A.*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with Local Rule 32(a)(4)(A) because this brief contains fewer than 14,000 words. This brief contains 13,956 words, excluding the parts of the document exempted by Fed. R. App. 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14-point font.

/s/ Marc J. Gottridge

**CERTIFICATE OF SERVICE**

I certify that the foregoing Joint Brief for Defendants-Appellees was filed with the Clerk using the appellate CM/ECF system on January 20, 2022. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system. I further certify that I caused six paper copies of the brief to be delivered to the Court by Federal Express overnight delivery.

/s/ Marc J. Gottridge_____